AO 91 (Rev. 11/11) Criminal Complaint

AUSA Christopher J. Stetler (312) 353-7602
AUSA James P. Durkin (312) 353-6630

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: 19 CR 805 |
|---|---|
| v. | |
| LUIS ARROYO | UNDER SEAL |

MAGISTRATE JUDGE VALDEZ

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or around August 2019 and continuing until in or around October 2019, at Highland Park, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 666(a)(2) | Corruptly offering and agreeing to give anything of value to any person, with intent to influence or reward an agent of the State of Illinois, a state that has received benefits in excess of $10,000 under a federal program in 2019, in connection with any business, transaction, or series of transactions of the State of Illinois involving anything of value of $5,000 or more |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

CURTIS A. HEIDE
*Special Agent*
*Federal Bureau of Investigation*

Sworn to before me and signed in my presence.

Date: October 24, 2019

City and state: Chicago, Illinois

*Judge's signature*

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, CURTIS A. HEIDE, being duly sworn, state as follows:

### I. Background

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since approximately May 2006. I am currently assigned to a public corruption squad of the FBI, and my responsibilities include the investigation of white-collar crimes, including bribery, extortion, mail fraud, and wire fraud. I have participated in the analysis and targeting of phone numbers used in furtherance of public-corruption and fraud offenses, and I have participated in the execution of multiple federal search warrants.

2. I have been involved in the investigation of LUIS ARROYO concerning his involvement in violations of federal law, including Title 18, United States Code, Section 666(a)(2) (the "**Subject Offense**"), which prohibits corruptly giving or offering anything of value to any person with intent to influence or reward an agent of a State government in connection with any business, transaction, or series of transactions of the government involving anything of value of $5,000 or more.

3. The information contained in this affidavit is based on my participation in this investigation, consensually-recorded conversations and meetings, information provided by a cooperating witness, the results of physical surveillance, review of records obtained from various parties, discussions with other law enforcement agents

with knowledge of this investigation, information provided to me by other law enforcement agents with knowledge of this investigation, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted. Since this affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4. This affidavit is submitted in support of a criminal complaint charging ARROYO with committing the **Subject Offense**.

5. Reference is made to lawfully recorded conversations in this affidavit. In certain instances, these conversations are summarized and placed in context. My understanding of these conversations (which often appears in brackets) is aided by the content and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, the experience of other law enforcement agents and officers in this investigation, my discussions with other law enforcement officers, and other evidence developed during the course of this investigation. The times listed for recorded conversations are approximate. Further, summaries of the recorded conversations herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

II. **Summary of Probable Cause**

6. There is probable cause to believe that LUIS ARROYO, the Illinois State Representative for the Third District, has committed the **Subject Offense**. On or

about August 2, 2019, ARROYO offered CW-1, an Illinois State Senator, $2,500 per month in return for CW-1's support of sweepstakes-related legislation in the Illinois Senate that would benefit Individual A. On or about August 22, 2019, ARROYO provided CW-1 with a check for $2,500 as an initial payment, with the expectation of providing additional monthly $2,500 payments for six months to a year. This check was made payable to a nominee of CW-1 for the purpose of concealing the illicit payment to CW-1.

### III. Facts Establishing Probable Cause

#### A. Background

7. According to publicly available information, LUIS ARROYO has been the Illinois State Representative for the Third District since 2006. He is currently the Assistant Majority Leader in the Illinois House of Representatives. According to publicly available information, including information obtained from the website www.usaspending.gov, the State of Illinois has received benefits under federal programs in excess of $10,000 in 2019.

8. According to information obtained from the Illinois Secretary of State's website, LUIS ARROYO is a manager of Spartacus 3, LLC ("Spartacus"). According to information obtained from the City of Chicago's website, LUIS ARROYO, with a listed employer of Spartacus, is a registered lobbyist with the City of Chicago.

9. I have obtained a copy of a lobbying agreement dated August 13, 2018, between lobbyist Spartacus and client Company B from the website maintained by the City of Chicago. This agreement bears what appears to be ARROYO's signature.

The agreement provides, "Client retains the Lobbyist to represent its interest in business development, marketing, and other governmental matters before aldermen, legislative bodies, administrative bodies, boards and commissions within the City of Chicago to achieve the Client's goals . . . . In consideration for the services to be rendered under this Agreement, Client shall pay Lobbyist Two-Thousand Five-Hundred Dollars ($2,500.00) every month during the term of this Agreement." According to the agreement, Spartacus was retained by Company B to lobby the Chicago City Council in connection with legislative action on a sweepstakes ordinance.

10. According to information obtained from the Illinois Secretary of State's website, Individual A is the manager of Company A.

11. According to publicly available information, Cooperating Witness 1 ("CW-1") is an Illinois State Senator.[1]

---

[1] CW-1 became a source for the FBI in 2016. CW-1 was admonished multiple times regarding CW-1's responsibility to report CW-1's participation in any unauthorized illegal activity. CW-1 was closed as an FBI source on or about November 3, 2016, after the FBI obtained information that CW-1 had submitted false income tax returns to the Internal Revenue Service. CW-1 had not disclosed that unauthorized illegal activity to the FBI. When subsequently confronted by law enforcement, CW-1 admitted to submitting false income tax returns. According to a law enforcement database, CW-1 has no criminal convictions. CW-1 expects to be charged with an offense relating to his false income tax returns and is cooperating with the hope that CW-1's cooperation will lead to a reduced sentence in connection with any charge brought against CW-1. No promises have been given to CW-1 regarding what, if any, benefits CW-1 will receive in return for CW-1's cooperation. The information provided by CW-1 as set forth in this affidavit is corroborated by, among other things, the consensual recordings made by CW-1.

**B.   ARROYO Corruptly Offers to Pay CW-1 in Return for CW-1's Support of Sweepstakes Legislation.**

12.   CW-1 has advised law enforcement that ARROYO had approached CW-1 in the Spring 2019 legislative session concerning the passage of sweepstakes-related legislation.

13.   CW-1 has advised law enforcement that ARROYO has used telephone number (312) XXX-3444 ("**Target Phone 1**") to communicate with CW-1.[2] CW-1 has also provided law enforcement with copies of electronic communications between CW-1's cellular telephone ("CW-1 Phone") and **Target Phone 1**. On or about July 30, 2019, at approximately 10:19 a.m., CW-1 received an incoming electronic message on CW-1 Phone from **Target Phone 1**, used by ARROYO. The message said, "[CW-1], Luis Arroyo call me back."

14.   On or about August 1, 2019, at approximately 1:37 p.m., CW-1 received two incoming electronic messages on CW-1 Phone from **Target Phone 1**, used by ARROYO. The messages said, "Let's meet at [a restaurant in Highland Park, Illinois] . . . . 11:00 AM."

15.   On or about August 2, 2019, at approximately 10:45 a.m., CW-1 had a consensually-recorded meeting with ARROYO, Individual A, and Individual A's

---

[2]   I further believe LUIS ARROYO is the user of **Target Phone 1** based on, among other things, the following: (1) ARROYO self-identified himself as the user of **Target Phone 1** in the electronic message referenced later in this paragraph; (2) the comparison of ARROYO's voice as captured in publicly available internet videos to the voice of the user of **Target Phone 1**; (3) ARROYO subsequently attended a meeting which was arranged through the use of **Target Phone 1**; and (4) according to phone records, **Target Phone 1** is subscribed to ARROYO.

5

associate at the restaurant located in Highland Park, Illinois identified by ARROYO the day before. During the meeting, ARROYO corruptly offered to make periodic payments to CW-1 in return for CW-1's support of sweepstakes legislation. Specifically, ARROYO said, "I'm gonna do a trailer bill for the game, for the sweepstakes. I talked to [a high-ranking state official]. I talked to a lot of people." [Based on my training and experience, and discussions with witnesses and fellow law enforcement agents, I believe that a "trailer bill" is legislation that clarifies and addresses unresolved aspects of prior legislation.] Later in the conversation, Individual A discussed Individual A's interest in the sweepstakes industry, and ARROYO asked, "Do you have legislation?" Individual A answered, "Oh, yeah." ARROYO asked, "Why don't you get it to [CW-1]?" Individual A answered, "I honestly was under the opinion that [a lobbyist] gave it to you . . . . I'll make sure you get it." ARROYO said that sweepstakes gaming was legal, adding, "I worked with [Individual A], ah, as consultant. I cannot work as a legislator with somebody if it's illegal. I just can't. He knows that. I cannot be part something that's illegal. That's just like being part of the mob or being part of a gang that's selling drugs. I can't be part of that. I'm not going to taint my reputation for something that's illegal. Now, if he ever goes to court or anybody goes to court and they say the sweepstakes is illegal, I can't, I can't have no part of it . . . . Nobody has said it's illegal, so that's why I keep pushing, and I'm pushing forward to try to get something in the veto session, to try to get a shell bill. Hopefully [Individual A] can get you the bill. I would like for you to carry the bill . . . . I don't have nobody in the Senate." [Based on my training and

6

experience, and discussions with fellow law enforcement agents and witnesses, I believe that ARROYO was asking CW-1 to sponsor and support the sweepstakes legislation in the Illinois Senate.] Thereafter, Individual A described state legislation he wanted CW-1 to support, and ARROYO asked, "[C]an we get you the language, and then you could consider. . ." CW-1 interjected, "Get me the language." ARROYO said, "I'm gonna get you the language, and we'll have a conversation again to see if it fits your needs to be able to try [unintelligible]. When a veto session[3] comes up, we'll start working on it. If it doesn't get passed during the veto session, we could probably push it." CW-1 added, "See what happens after," and ARROYO responded, "Yeah."

16. Thereafter, CW-1 asked to speak with ARROYO alone. The two went outside the restaurant, where they were observed by law enforcement conducting physical surveillance. CW-1 said, "This is you and I talkin' now . . . . Nobody else." ARROYO said, "Whatever you tell me, [CW-1], stays between you and me . . . . [T]hat's my word." CW-1 asked, "What's in it for me, though?" ARROYO said, "I'm a paid consultant, okay? . . . . If you put a price on it, I mean, if you want to get paid, you want somebody else to get a check monthly, a monthly stipend, we could put them on contract. We could put you on a contract. You tell me what it is. Tell me what you need." [Based on my training and experience, and discussions with fellow law enforcement agents and witnesses, I believe that ARROYO was asking how much

---

[3] Based on my training and experience, and discussions with fellow law enforcement agents and witnesses, I believe that a veto session is a period in which the Illinois legislature convenes to consider bills that the Governor has previously vetoed. Based on publicly available information, I believe the Illinois legislature will next convene for a veto session on or about October 28, 2019.

CW-1 wanted to be paid in return for supporting the sweepstakes legislation.] CW-1 said, "I'm lookin' for something, you know? I'm in the twilight, you know." ARROYO said, "I understand very well . . . . I understand. If I'm doin' okay, you're gonna do okay. We'll just, me and you will start meeting from now on. Let me give you the legislation. We'll be more open, and we'll talk to each other to make sure that you're rewarded for what you do, for what we're gonna do moving forward. Same way I'm getting paid, I'm getting paid 25, 2500 dollars a month.[4] And I'm lookin' to get a little bump from that because I've been really working my ass off." CW-1 said, "That'd be nice." ARROYO continued, "So that would be guarantee from me to you. Okay?" CW-1 answered, "Alright." ARROYO responded, "Thank you, buddy." CW-1 said, "That's all I wanted to talk, that stays between you and I." ARROYO said, "[L]et's be clear, right? And we're clear . . . . My word is my bond and my, my reputation."

17. On or about August 15, 2019, at approximately 12:43 p.m., CW-1 sent an electronic message on CW-1 Phone to **Target Phone 1**, used by ARROYO. The message said, "Hay Lou I haven't receive your draft legislation yet! Why don't you email it to me? We can get together sometime next week!" ARROYO sent a reply electronic message from **Target Phone 1** that said, "Coming soon."

---

[4] I believe ARROYO explained to CW-1 that ARROYO was already receiving payments from Individual A of $2,500 a month in return for his legislative support, and that CW-1 could also receive money in return for his support with sweepstakes legislation. Law enforcement has obtained checks from Company A made payable to the order of Spartacus for the following amounts dated on the following dates: $2,500 on or about November 1, 2018 (two checks); $2,500 on or about January 3, 2019 (two checks); $2,500 on or about February 1, 2019; $2,500 on or about March 5, 2019; $2,500 on or about April 5, 2019; $7,500 on or about May 3, 2019; and $2,500 on or about August 1, 2019.

8

18. On or about August 19, 2019, at approximately 3:28 p.m., ARROYO, using **Target Phone 1**, spoke with CW-1. During the call, ARROYO discussed how an initial unlawful payment would be made to CW-1. Specifically, ARROYO said, "[W]e got all the stuff ready for you. We wanted . . . to see if you had time to, uh, if we could get together this week . . . . [W]e want to straighten that up. Then the, uh, where do you want to send the other stuff [payment] to? Uh, do you want to put it under somebody else's name or your stuff, your name?" [Based on my training and experience, and discussions with fellow law enforcement agents and witnesses, I believe that ARROYO was asking if CW-1 wanted to transmit the illicit payment through a third-party in order to conceal CW-1's receipt of the payment.] CW-1 answered, "Alright, let me, let me think about that, too." ARROYO and CW-1 then agreed to meet on August 22, 2019.

   C. **ARROYO Makes an Initial Payment of $2,500 to CW-1 in Return for CW-1's Support of Sweepstakes Legislation.**

19. On or about August 21, 2019, at approximately 3:28 p.m., ARROYO, using **Target Phone 1**, spoke with CW-1. During the call, CW-1 and ARROYO discussed meeting the following day. Specifically, ARROYO asked, "[W]e ready for tomorrow? 11 o'clock?" CW-1 answered, "Yeah." Moments later, CW1 asked, "[W]ho's all comin'?" ARROYO answered, "Just me and [Individual A]." CW-1 said, "I like this to stay between you and I. A lot of this, you know what I mean?" ARROYO responded, "Okay, you want me? You know what? I'll tell you what. I'll go by myself." Later CW-1 said, "[C]an you just email me a copy of what we want to talk about tomorrow so I can look at it ahead of time so if I see anything glaring, . . . I could say,

9

'Hey, man, this won't, this won't play'?" ARROYO replied, "I won't have time to email it to you, unless he, he [Individual A] wants to email it to me. Let me see if he emails it to me. Then I could just email it to you."

20. Law enforcement provided CW-1 with the name and contact information for someone to use as an undercover nominee to receive the initial payment ARROYO had offered to CW-1.

21. On or about August 22, 2019, at approximately 10:43 a.m., CW-1 had a consensually-recorded meeting with ARROYO at a restaurant in Skokie, Illinois. During the meeting, ARROYO provided CW-1 with a payment of $2,500 in the form of a check. Specifically, ARROYO said, "I'm going to give you this here. This is, this is, this is the jackpot. Give me the name [of CW-1's nominee]. Just put the name down here." CW-1 provided the undercover nominee name CW-1 had previously been given by law enforcement. According to CW-1, ARROYO wrote the name of the undercover nominee provided to CW-1 by law enforcement on a check.[5] ARROYO said, "I'll put it on my phone . . . . To, to what company and what address?" CW-1 answered, "No, she's [the undercover nominee] just a friend, and I think, you know, I'll run it [this and future payments] through her . . . . I'll give you my home address. You can mail anything there." ARROYO responded, "No, no, we're not going to mail anything. We're just going to write a check. We're going to write you a check per month . . . . Six months to a year. What do you prefer?" CW-1 answered, "Whatever. A year sounds great." ARROYO continued, "Okay, so just read it [proposed

---

[5] On the check, ARROYO misspelled the name of CW-1's nominee by one letter.

10

sweepstakes-related legislation], and see if there can't be any [unintelligible]." CW-1 said, "If I gotta make, if we got to make changes, it's a lot easier to make it off the email." ARROYO replied, "I'll send it to you, but I don't have your email address . . . . You can change this, and I'm going to give it to your email right now. When I get to the car, I'm gonna email it to you." CW-1 said, "I'm not a computer expert. I'll tell you that." ARROYO responded, "Neither am I . . . . That's why I wanted to come and show it to you and go over it." CW-1 said, "I'm not too happy about doing this, but I'm doin' it for ya." ARROYO replied, "I know you're not." Later ARROYO said, "I'm going to send you this, and you can see what, this is not concrete."

22. Immediately after the meeting with ARROYO concluded, CW-1 provided law enforcement with proposed sweepstakes-related legislation, a Company A check, dated August 22, 2019, made payable to the undercover nominee in the amount of $2,500, and Individual A's business card bearing Individual A's name and the address for Individual A's email account, all of which—according to CW-1—ARROYO had given to CW-1 during the meeting.

23. On or about August 22, 2019, at approximately 2:02 p.m., CW-1 received an email from Individual A's email account (as reflected on the business card for Individual A that ARROYO provided to CW-1 earlier that day). Attached to the email was a document that provided, in part:

> [L]egislation is needed to address the regulation and taxing of electronic sweepstakes.
>
> The proposed bill amends the Use Tax Act, the Service Use Tax Act, the Service Occupation Tax Act, and the Retailers' Occupation Tax Act to provide that product promotion

sweepstakes vouchers are considered tangible personal property under those Acts and thus subject to sales tax at the point of sale. The bill further provides that the Department of Revenue shall share the revenue derived from the annual registration fees with municipalities. Subject to certain enumerated exceptions for licensed fraternal and/or veterans' establishments, the bill also limits the number of electronic product promotion sweepstakes kiosks at any one location and clarifies provisions in the Prizes and Gifts Act and Criminal Code of 2012 to ensure uniform treatment of all sweepstakes promotions.

24. On or about August 26, 2019, at 5:22 p.m., CW-1 received an email from Individual A's email account. The email, which had a subject line of "Sweepstakes Thank you," said, "I appreciate your help and assistance. I know there are several challenges in front of me with sweepstakes. Please let me know if there is anyone else you would recommend I meet with and share information. Respectfully, [Individual A]."

## IV. Conclusion

25. Based on the foregoing, there is probable cause to believe that LUIS ARROYO has committed the **Subject Offense**.

FURTHER AFFIANT SAYETH NOT.

_____
CURTIS A. HEIDE
*Special Agent*
*Federal Bureau of Investigation*

SUBSCRIBED AND SWORN to
before me on October 24, 2019.

_____
MARIA VALDEZ
*United States Magistrate Judge*