IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUIS ARROYO | 1:19-cr-00805-1<br><br>Hon. Judge Steven C. Seeger |

**DEFENDANT'S SENTENCING MEMORANDUM**

On November 3rd, 2021, Luis Arroyo entered a blind plea of guilty to Count One of the superseding indictment in that he committed the offense of Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346.

Mr. Arroyo now submits this memorandum in order to assist the Court in fashioning the most appropriate sentence by addressing each of the available sentencing options under the provisions of 18 U.S.C. §3553(a), as now constitutionally required by the Supreme Court in light of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). This memorandum will supplement the Presentence Report ("PSR") and submit reasons why this Court should consider and grant a sentence that is below or "in variance" with the advisory Guideline level based on various factors in mitigation.

Luis Arroyo – a life-long public servant – has taken full and public responsibility for his actions that bring him before this Honorable Court. Numerous character letters and other information overwhelmingly illustrate Mr. Arroyo's lifetime of unselfish dedication to the greater good.

1

Excessively punishing this particular deviation from a lifetime of otherwise exemplary behavior accomplishes no meaningful purpose, including those argued by Probation in the sentencing recommendation submitted to the Court. For the reasons set forth herein, a sentence of probation is sufficient and not greater than necessary to accomplish the goals set forth in 18 U.S.C. § 3553(a).

## OBJECTIONS TO PSR

### I. The Loss Enhancement is Incorrect.

There are errors in, and Mr. Arroyo has objections to, the PSR. The most important – because it directly impacts his Guidelines range – is that Probation has overstated the loss amount.[1] The correct loss amount is $7500, so the Guidelines enhancement under USSG §§ 2C1.1(b)(1) and 2B1.1(b)(1)(B) is two levels (versus the four levels proposed in the PSR, and the six levels advocated by the government). That changes Mr. Arroyo's adjusted base offense level to 19. With a criminal history category of I, the Guidelines range is 30-37 months.

In sum, Mr. Arroyo has pleaded guilty to attempting, on behalf of co-defendant James T. Weiss, to pay former Senator Terry Link[2] to help Mr. Arroyo's lobbying client, VSS, Inc. advocate for sweepstakes gaming legislation in the Illinois Senate. The total amount discussed, that was contemplated to be paid, was $7500. The government has provided no evidence, much less sustained its burden of proof, to show that any greater amount was part of the conduct involving Mr. Link. This $7500 is the amount that should be considered the loss amount here.

---

[1] For all the same reasons, the forfeiture amount also is overstated. The only proceeds Mr. Arroyo received that were related to Count One conduct are $7500. The government has not sustained its burden to demonstrate any additional monies are subject to forfeiture.

[2] At the time Mr. Link was meeting with Mr. Arroyo to seek payment for supporting sweepstakes gambling, he was a cooperating witness, trying to make amends for twice committing tax fraud and lying to the government.

As the PSR and the government have acknowledged, in August 2018, the lobbying entity owned by Mr. Arroyo and his wife (Spartacus) entered into a contract with his co-defendant Mr. Weiss' company (VSS). PSR ¶¶ 8, 26. The purpose of the agreement was for Mr. Arroyo to lobby the *Chicago City Council regarding a City sweepstakes ordinance*. *Id.* Mr. Arroyo did indeed lobby the Chicago City Council, and that effort is not unlawful nor included in the superseding indictment allegations. All payments from VSS to Spartacus from November 1, 2018 to October 1, 2019 were for this lawful lobbying activity, except the $7500 relating to Mr. Link. None of the support proffered by the government (in its version of the offense) demonstrates otherwise, or is sufficient to overcome their burden of proof on the enhancement. Left to guess about how much of Mr. Arroyo's consulting income from Spartacus should be attributed to the offense, the PSR concludes, "while it is possible he lobbied on both fronts simultaneously, the probation officer cannot parse out from the payments a percentage of funds towards each entity." *Id.* at ¶ 26. The government must make a "reasonable estimate" of losses, based on a preponderance of the evidence. *United States v. Yihao Pu*, 814 F.3d 818, 825 (7th Cir. 2016). The record must "provide enough information for [the Court] to determine what the correct intended loss amount is." *Id.* at 826. *See also United States. v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (the government must satisfy its burden with explicit evidence of loss); *United States v. Liss*, 265 F.3d 1220, 1230 (11th Cir. 2001) (loss calculations must be supported with "reliable and specific evidence.") Combining lawful and unlawful proceeds from an offense based on guesswork is impermissible and contrary to the rule of lenity applied in criminal cases.

Moreover, the evidence the government relied upon in its version of the offense to argue that all payments made to Mr. Arroyo under the agreement were part of the charged conduct is not as strong as the government argues and the PSR credits. First, it is sparse:

- State Sen. Munoz testified the first time Mr. Arroyo approached him was May 2019, to *arrange* a meeting. GV Ex. E at 12.

- Nicole Budzinski, a member of Gov. Pritzker's staff in Spring 2019, testified that Mr. Arroyo was a sweepstakes advocate, but that he *never obtained a meeting* with the Governor to discuss his interest in the legislation. GV Ex. B at 15, 17-18. Ms. Budzinski further testified that Mr. Arroyo could have been seeking a meeting with Gov. Pritzker about "a lot of different things." *Id.* at 18.

- State Rep. Rita testified that in Fall 2018, he and Mr. Arroyo *discussed legislation*, including about sweepstakes. GV Ex. A at 16. In Spring 2019, Mr. Arroyo advocated for sweepstakes legislation in meetings among House members. *Id.* at 18. Rep. Rita did not know Mr. Arroyo also had a lobbying agreement. *Id.* at 21.

- State Rep. Zalewski testified that Mr. Arroyo spoke to him once on the House floor in a "wishy washy" fashion about sweepstakes, which Rep. Zalewski thought was a "really silly" issue. GV Ex. C at 20. More specifically, Rep. Zalewski said Mr. Arroyo "said something to the effect of either I'm interested in this issue or around this issue. So that's sort of where we left it." *Id. He did not understand Mr. Arroyo to be lobbying*. *Id.* at 22.

- Sen. Link testified that Mr. Arroyo spoke to him in May and July 2018 about sweepstakes, asking "are you okay with it." GV Ex. D at 11. *Sen. Link did not know what Mr. Arroyo was even referring to*. *Id.* They did not speak again about the issue until Sen. Link was a cooperating witness who arranged meetings to discuss the issue and demand payment for his efforts, which occurred in a brief period beginning in August 2019. *Id.* at 15.

On the other hand, other witnesses testified in the grand jury (and in witness statements provided in proffers or to agents) that Mr. Arroyo did not discuss sweepstakes with them. Still other witnesses testified Mr. Arroyo did not discuss state-level sponsorship or support with them. For example: Sam Panayotovich, a lobbyist involved in gaming issues, testified that Mr. Arroyo lobbied City of Chicago aldermen, which would have been legal, since Mr. Arroyo was not then a city official. DV, Ex. 1, at 19. In another example, John Adreani, one of VSS's owners, testified that the contract between his company and Spartacus was to lobby city representatives to keep sweepstakes legal. DV, Ex. 2, at 15, 18. He was unaware of Mr. Arroyo working at the state level on sweepstakes matters. *Id.* at 16. Anthony DeMarco, a business affiliate of Weiss in the

4

sweepstakes business, testified that in 2018, Mr. Arroyo met with Alderman O'Connor "to educate he alderman to what the benefits of sweepstakes are to small businesses . . . ." DV Ex. 3 at 17. In September 2019, he signed a check to Mr. Arroyo for the purpose of paying him to lobby the City. *Id.* at 24.

Even reading the limited testimony in the government's favor, Mr. Arroyo's 2018 meetings alone are not illegal. *McDonnell v. United States* and its progeny have made it clear that "setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more – does not fit that definition of 'official act.'" *McDonnell*, 579 U.S. ___; 136 S.Ct. 2355 (2016), slip op. at 21. It is clear from the evidence that Mr. Arroyo spoke to many people about sweepstakes gaming and all its possibilities. To the extent those discussions were to arrange meetings, or to have a "wishy washy" or similar discussion about a topic on and off the legislative agenda, those conversations are acceptable and certainly not criminal. The loss amount should be $7500.

## II. Other Statements in the PSR Are Without Sufficient Support to Be Credited.

Some of the PSR's "findings" are irrelevant to the charged offense, incorrect or otherwise unnecessary to this Court's sentencing determination. First, if Mr. Arroyo's home is valued at $415,000, it cannot be true that "a lot" of the funds he received from Spartacus (at most, $32,500) were "traced to construction of the defendant's home in Florida." PSR ¶¶ 15, 90. This stray comment should be ignored, and certainly as to forfeiture or loss.

Second, the PSR alleges Mr. Arroyo's proffers were less than candid. PSR at ¶ 18. This is another stray comment that is inconsistent with numerous discussions between counsel about Mr. Arroyo's two lengthy interviews about many topics, including his acceptance of responsibility in this case. Indeed, on the same day he self-surrendered to answer for the initial charges brought

5

against him, he met with the government and fully admitted to the charged conduct. He later proffered (pursuant to a letter agreement) and again accepted responsibility for his conduct. The government may or may not be using the information provided in its pursuit of other cases; we do not know one way or the other. The FBI notes do not say Mr. Arroyo would not discuss certain topics. This paragraph of the PSR should be deleted.

Third, the PSR notes that Mrs. Arroyo did not return a voicemail message from the probation officer. PSR ¶ 54. At the Court might imagine, since being charged, the Arroyos have received threatening and obnoxious messages, and they did not answer numbers they do not recognize. While there is no need to change this PSR paragraph, Mr. Arroyo asks the Court to read carefully Mrs. Arroyo's character letter attached in Defendant's Exhibit A, in which she corroborates the PSR and also details her myriad health issues (requiring Mr. Arroyo's full-time care).

## **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

The purpose of sentencing as reflected in 18 U.S.C 3553 is not to be punitive but rather to be just based on the offense and offender. Under 18 U.S.C. §3553(a)(2) the Court shall impose a sentence sufficient, but not greater necessary to reflect the purposes of sentencing, including, the need for just punishment, the need for deterrence, protection of the public, and the rehabilitation of the defendant. §3553 also orders courts to consider the history and characteristics of the defendant as well as the nature and circumstances of the offense.

The probation officer's recommended sentence appears to be based almost entirely on the aggravating factor that there is a "laundry list" of elected officials in Illinois who have committed felonies. Sentencing Recommendation at 2. On the other hand, in mitigation, the probation officer acknowledged that the first custodial sentence to be imposed on Mr. Arroyo, a 67-year-old man,

will have a "profound impact" on him. On balance, these factors – as well as many others that do not appear to have been adequately considered – merit a sentence of probation.

I.     **Mr. Arroyo Dedicated His Life to Lawful Public Service; This Crime Does Not Define His Contributions.**

The court should consider Mr. Arroyo's many years of public service, charitable actions, and dedication to his community when determining a sentence. U.S.S.G. §5H1.11 treats "military, civic, charitable, or public service; employment related contributions; and similar prior good works" as discouraged departure grounds. In light of *United States v. Booker*, 543 U.S. 220 (2005), this restriction is advisory only and does not preclude below-guideline sentences that reflect the §3553(a) factors. In *United States v. Thurston*, 544 F.3d 22 (1 Cir. 2008), the court affirmed district court's choice of 3 months rather than 60-month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, defendant's charitable work, community service, generosity with his time, and the spiritual support and assistance he provided others. Like *Thurston*, Mr. Arroyo has dedicated himself to extensive charitable work, public service, community work, generosity with his time, and has provided support and assistance to others for decades.

The PSR describes an accurate rags to riches story of Mr. Arroyo. His parents were factory workers raised in Puerto Rico, who moved to New York when Mr. Arroyo was five years old to offer their children more opportunities. PSR ¶¶ 55, 56. Mr. Arroyo did not finish high school with his peers, because he needed to work to help support his family. *Id.* at ¶ 82. Throughout his adolescence, he witnesses regular alcohol-induced beatings by his father of his mother, and his brother Roy was murdered when Mr. Arroyo was in his 20s. *Id.* at ¶ 56.

Notwithstanding this chaotic start, Mr. Arroyo found true love and married his only wife 47 years ago. They have three children and several grandchildren, and the family enjoys a close bond. *Id.* at ¶ 62. Mr. Arroyo is primarily responsible for his wife's constant doctor's appointments, and he helps administer her medications – all made more difficult when he lost his State pension and health insurance upon pleading guilty. *Id.* at ¶¶ 62-66. Mr. Arroyo has worked his entire life to support his family; he started as a bricklayer in 1982 for the Chicago Department of Water Management and stayed with the agency for 27 years. *Id.* at ¶ 88. He ran for the Illinois House of Representatives (and won) in 2006 and held that position for 13 years. *Id.* at ¶ 87. To supplement his public service income, Mr. Arroyo and his wife started a consulting business, Spartacus 3 LLC, which they owned from 2016-21. *Id.* at ¶ 86. His current monthly net income is less than his monthly net expenses. *Id.* at ¶¶ 90-97.

After he pleaded guilty, Mr. Arroyo reached out to some family and friends, seeking their support in the form of character letters. Word quickly spread and the response was overwhelming – resulting in 90 letters from friends, family, community leaders, political opponents, retired judges, and others, whose lives Mr. Arroyo touched in many ways. The letters are attached in alphabetical order, and they are worth a careful read, so the Court will fully appreciate the many ways Mr. Arroyo positively affected people's lives. Taken together, and even apiece, they paint a full picture of a person whose life was selfless, marred by an error in judgment at the tail end. Mr. Arroyo is not a bad person; rather he is a good person who made a mistake in judgment.

## II. A Prison Sentence Will Not Meaningfully Deter Others.

Of course, a lifetime of good works must be balanced by the nature and circumstances of this offense – a brief dalliance with corruption, encouraged by another corrupt official working for the government. Mr. Arroyo never should have considered paying Mr. Link for his assistance in

getting a sweepstakes bill passed in the Illinois Senate, much less taken affirmative steps to complete the crime. However corrupt the act was, the effect was immaterial in the end. Sweepstakes legislation never was meaningfully considered at the State level, and unlike Mr. Link, Mr. Arroyo has lost his pension, insurance, and pride in service. Since the government and the press announced the charges against Mr. Arroyo in 2019, it has continued to charge other politicians, and the press reports daily about the potential for the United States to charge even more. Indeed, Mr. Arroyo himself was undeterred by prior new reports when he met with Mr. Link in 2018. Imprisoning him will not change those facts. A prison sentence will shorten his life, may also shorted his wife's life. It is no more effective than draining Lake Michigan with a spoon.

As for specific deterrence, Mr. Arroyo is done with politics, and is leading a life away from the spotlight. He spends his days with his family and has learned his lesson.

### III. The court should consider Mr. Arroyo's low risk of recidivism.

There are a number of factors the court should consider regarding Mr. Arroyo's low risk of recidivism and post offense rehabilitation. Mr. Arroyo is 67 years old, has a long career of public service, community work, and charitable deeds, and has a Criminal History Level of I.

Studies by the United States Sentencing Commission have repeatedly shown that older offenders at sentencing are at lower risk for reoffending.[3][4]

Additionally, the Seventh Circuit has held that a defendant's strong employment history justifies a reduced sentence under § 3553(a). *See*, *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) (holding that, under § 3553(a), a district court may rely on a defendant's employment

---

[3] See Recidivism Among Federal Defenders: A Comprehensive Overview (2016). Defendants "over the age of forty... exhibit markedly lower rates of recidivism in comparison to younger defendants.
[4] See Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines, at 12, 28 (2004) ("Recidivism rates decline relatively consistently as age increases").

history in arriving at a below-guidelines sentence. Courts have likewise held that a defendant's "positive personal characteristics, including his solid work record and good conduct over the past few years" can demonstrate that a guidelines sentence is greater than necessary to protect the public under § 3553(a)(2)(C). *United States v. Thomas*, 595 F.Supp. 2d 949 (2009).

The United States Sentencing Commission has also found that there is lower risk for recidivism if the Defendant has maintained stable employment in recent past … and recidivism rates are lower for Non-Violent Offenders.[5]

The PSR and character letters outline Mr. Arroyo's multiple decades of public service, community work and charitable deeds. Mr. Arroyo has dedicated his time to his family since the instant offense. This Honorable Court can be assured that Mr. Arroyo is not a risk for recidivism.

**IV.    A Prison Sentence Would Create an Unwarranted Disparity in Sentences.**

As set forth in 18 U.S.C. § 3553(a)(6), Mr. Arroyo's sentence should not be unnecessarily disparate from the sentences imposed on other defendants with similar records found guilty of similar conduct. Mr. Arroyo has pleaded guilty to an offense lasting a very short period of a life-long career dedicated to public service and involving only $7,500 in loss related to a public corruption charge (Count I). The loss amount involved in Mr. Arroyo's admitted conduct – even at the higher level assigned by Probation – is on the low end of other reported public corruption convictions. On the other hand, most defendants who received sentences involving imprisonment of over 12 months were involved in schemes that resulted in a much larger monetary loss (i.e., greater than $100,000). As demonstrated in Defendant's Exhibit B, which summarizes other conduct by defendants convicted of public corruption charges, loss amounts and sentences, a

---

[5] See Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines, at 12, 28 (2004).

sentence of probation is appropriate to avoid unnecessary disparities in sentences for individuals convicted of similar conduct.

Defendants Acevedo, Bartley, Curtis, Elgin, Hammon, Howard, Muñoz, Nangle, Nayak, and Salao were convicted of corruption charges resulting in a loss amount range between $21,311.00 and $50,657.46. Their resulting sentences[6] ranged from 3 years' probation to 24 months imprisonment with a median of approximately 12 months imprisonment. Moreover, defendant Brooks, a former state representative whose conduct resulted in at least $258,561 of monetary loss, was sentenced to a year and a day of imprisonment. Mr. Arroyo's conduct resulted in only 12.6% of the amount of loss caused by Brooks, and his sentence should not be greater. Mr. Arroyo's case is more similar to that of defendant Muñoz, who currently awaits sentencing following his conviction for misappropriating approximately $37,891.99 of political action committee (PAC) funds.

**Character Letters**

The outpouring of support for Luis Arroyo is immense. In undersigned counsel's 25 years of practice, he has never seen this volume of character letters for any defendant. The character letters portray Mr. Arroyo has a man who has always been dedicated to his family and community. They outline the life of a man who has continuously put the needs of others first and has always been willing to lend a helping hand. Many of the 90 letters written on Mr. Arroyo's behalf detail instances in which Mr. Arroyo has helped the writer in times of need. The letters provided below are just a small sample of this overwhelming outpouring of support.[7]

---

[6] For defendants Acevedo and Muñoz, who have not yet been sentenced, the anticipated advisory sentencing guidelines range (Acevedo) and the government's sentencing memorandum (Muñoz) are referenced.
[7] Character Letters attached as Defendant's Exhibits A, C, and D.

**Denise Arroyo** is Luis Arroyo's daughter. Denise states in pertinent part:

"… My dad first and foremost is a strong family man. He would sacrifice his life, without question, to protect his family …

… I married my sons' father only to find out 2 weeks later he cheated and had another woman pregnant, so I filed for divorce. My dad told me if this is what you want to do, then we are going to do it as a family. I knew being a single mom wasn't going to be easy. I was so happy because I knew then and there that my baby and I would be fine. I was 19 and terrified, but I trusted my father 100%, and if he said I was going to be fine, then I knew I was going to be fine … He assured me and motivated me to stay in college when I doubted myself. When my son Jaylen was born, my dad did it all. He changed diapers, he fed him, he held him, he played with him for house. My dad was amazing. Although he worked fulltime, when he got home, he definitely made sure he turned on grandfather mode, so that I could focus on school and homework. I was able to work fulltime, go to school fulltime at night, and never have to worry about my son … He always reminded me that I was a mom, a great mom, and the sacrifices that we make for our children are made for them to prosper … I have nothing but gratitude for my dad, who taught me that with hard work, perseverance and the support of your family, you can accomplish anything. I was able to graduate from college with a bachelor's degree, make my family proud, and last, but not least, be a great and more present mom to my son.

… my dad and my oldest have a special bond as my dad is a grandfather and father to him when his biological father left and never turned back."

(Letter attached Exhibit A Pg. 4-5)

**Maribel Arroyo** is Luis Arroyo's wife. Maribel states in pertinent part:

"He is the most caring, adoring father to his children. He is his children's' best friend. They are his/our pride and joy. Luis has raised three "beautiful, educated, caring, loving and respectful human beings". I think God every day for putting Luis in my path, for helping me raised and being the best father …

Luis has been the same caring, loving, giving person through all of these years. That is one of the many qualities that I love about him. Many times, he has put people before himself. Especially me. He has been there in sickness and in health …"

(Letter attached Exhibit A Pg. 8-9)

**Dr. Ray Berryhill** is the Senior Pastor of Resurrected Lift Church International. Dr. Berryhill states in pertinent part:

> "While Mr. Arroyo served as 3rd District Representative, he supported our community outreach efforts on numerous occasions through financial and in-kind donations, attendance and participation, networking, and event promotion. Mr. Arroyo has always been kind, helpful, and a consistent advocate of our organization."

(Letter attached Exhibit A Pg. 11)

**Rose Bishop** was Luis Arroyo's Chief of Staff for nine years. Ms. Bishop states in pertinent part:

> "Throughout the years, I observed countless acts of kindness from Mr. Arroyo to the community. These included assisting the homeless, helping people that were on the fringe of being homeless, helping Dreamers with internships, and finding resources to help them continue in school.
>
> Supporting schools was very important to him. He welcomed all types of schools into the district – grammar, high school, public, and charter schools. He would be asked for computers, air conditioners, and general supplies to make it more comfortable for the children to learn. He helped improve, renovate, and replace playgrounds for these schools …
>
> I have even seen him help pay for funerals for constituents that had no means to hurry their loved ones."

(Letter attached Exhibit A Pg. 12)

**Angel Correa** has known Luis Arroyo as his former local State Representative and personally for a few years. Mr. Correa states in pertinent part:

> "I am writing this letter to bear witness to his generosity. A few years ago, I was going through a horrible divorce. And because of that I was on the brink of losing my house. The mortgage company was going to put my family and myself out on the street because I owed the bank $2,800.
>
> At that time Luis Arroyo was a State Representative. So, I walked over to his office with the threatening letters that I had received to ask if there was any possibility that I could be helped by any state program.

13

> To my absolute shock and disbelief, he offered to lend me the money so that I could bring my loan payments up-to-date and stay in the only home my children had ever known
>
> That was some years ago and I have already repaid him the money. But he did not have to do that. He could've just blown me off. He could've referred me to some government program where there probably would've been just a slim chance that I could've been helped out. But no. Instead, he took it upon himself to help a poor and desperate constituent of his district."

(Letter attached Exhibit A Pg. 22-23)

**Edward W. Gjertsen** is the Executive Director of the Schorsch Village Improvement Assn. Mr. Gjertsen states in pertinent part:

> "In 1955 we built a community center on W. Belmont Avenue. Over the years it became apparent that major renovations needed to be undertaken. As a not-for-profit organization, we were not able to bear the burden of these large expenses.
>
> I started to work with a former State Representative to apply for a State of Illinois Grant. Over 4 years transpired with nothing being accomplished. After a redistricting, Luis Arroyo became our new State Representative. I met with him, and he promised to work on it. I was skeptical as I left his office. Within three months, the paperwork was completed, the Grant was approved, and we started to receive funds to renovate our community center. Schorsch Village hosts six neighborhood functions per year, a picnic for families in the area, senior men and women functions, CAPS meetings, precinct voting, health fairs, and numerous other functions … Profits from our functions and rentals have been contributed to local food pantries, Shriners Hospital, and other charitable organizations.
>
> As a result of our work in the community, Schorsch Village was named the 24th best community in the country by Redfin Realty. None of this would have been able to be accomplished without the assistance of Luis Arroyo at a time that was most critical to our existence."

(Letter attached Exhibit C Pg. 4)

## **CONCLUSION**

Mr. Arroyo is truly sorry for what he has done and how he has disappointed those that he loves. When the Judgment Order is entered against Mr. Arroyo, he will become a felon for the first time in his life at age 67. He is profoundly humbled that his actions have not only affected

his community and his life, but also the lives of his closest loved ones. There is no denying the seriousness of Mr. Arroyo's transgressions, and he does not intend on doing so – he was clearly wrong. Instead, he offers himself to the mercy of this Court, to take into consideration not only those actions that brought him before this Court, but to take into consideration the full value of a man's life that was always committed to his family and to his community when fashioning its reasonable sentence.

Taking together the nature and circumstances of the instant offense, his personal history and characteristics, lifetime of charitable and public service, and considerations of recidivism, Mr. Arroyo respectfully asks this Honorable Court for leniency when imposing a sentence, one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

For the reasons set forth herein, and to be further discussed at the sentencing hearing, this Court should impose a sentence of probation on Mr. Arroyo. The punishment is sufficient but not greater than necessary to accomplish the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Counsel for Luis Arroyo

MICHAEL P. GILLESPIE
*Counsel for Luis Arroyo*
The Law Offices of Gillespie & Gillespie
53 W. Jackson Blvd., Suite 1062
Chicago, IL 60604
Tel. (312) 588-1281
Fax (312) 588-1284
michael@gillespieandgillespielaw.com

## CERTIFICATE OF SERVICE

       I hereby certify I electronically filed the foregoing with the Clerk of the Court for the United States, Northern District of Illinois and said filing complies with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

*/s/ Michael P. Gillespie*

Michael P. Gillespie

MICHAEL P. GILLESPIE
*Counsel for Luis Arroyo*
The Law Offices of Gillespie & Gillespie
53 W. Jackson Blvd., Suite 1062
Chicago, IL 60604
Tel. (312) 588-1281
Fax (312) 588-1284
michael@gillespieandgillespielaw.com